UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

NATIONAL GRID CORPORATION SERVICES, LLC,
and ERICK LLAGUNO,
      Plaintiffs,


     - vs -                                        Case No.: 2:13-cv-1275
                                                  (DRH)(ARL)


BRAND ENERGY SERVICES, LLC, and,
ACE AMERICAN INSURANCE COMPANY,
      Defendants.

_____

*Appearances*:

HAMMILL, O'BRIEN, CROUTIER,
DEMPSEY, PENDER & KOEHLER, P.C.               For Plaintiff
6851 Jericho Turnpike, Suite 250                 National Grid
P.O. Box 1306
Syosset, New York
      By: Rebecca J. Moulton, Esq.

SWEENEY AND SHEEHAN                       For the Defendants
1515 Market Street, 19th Floor
Philadelphia, Pennsylvania
      By: Elizabeth Dalberth, Esq.

TRIBLER ORPETT & MEYER, P.C.
225 W. Washington Street, Suite 1300
Chicago, Illinois
      By: David E. Schroeder, Esq.



**HURLEY, Senior District Judge**:


**MEMORANDUM & ORDER
ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

# I. INTRODUCTION

The present case is a declaratory judgment action. It relates to an underlying New York state court action brought by Plaintiff Erick Llaguno ("Llaguno")(hereafter, the "Llaguno Action") regarding claims for damages as a result of personal injuries he allegedly sustained on September 24, 2010, while working as an employee of Defendant Brand Energy Services, LLC ("Brand") pursuant to an agreement between Plaintiff National Grid Corporate Services, LLC ("Grid") and Brand (hereafter, the "Agreement").

Grid seeks declarations from this Court that Brand has breached its contractual duty to Grid by failing to secure "additional insured" coverage for Grid's benefit and that Ace American Insurance Company ("Ace"; and, collectively with Brand, the "Defendants") is in breach of contract for failing to defend and indemnify Grid in the underlying Llaguno Action. Brand counters that pursuant to the Agreement, it was not required to name Grid as an additional insured under Brand's liability insurance policy with Ace (hereafter, the "Policy"). Nor can Grid rely on the doctrine of "incorporation by reference" since there are no documents which will support such a showing beyond all reasonable doubt as required under applicable New York law.

Grid and the Defendants have cross-moved for summary judgment. (*See* ECF No. 63 ("Defendants' Summary Judgment Motion"); ECF No. 65 ("Grid's Summary Judgment Motion").) For the reasons that follow, Grid's Summary Judgment Motion is granted and the Defendants' Summary Judgment is denied.

*A. Factual Background*

1. Generally

Grid is an electricity and gas utility company, which operates, *inter alia*, on Long Island.

2. The Bidding Process

In Spring 2012, Grid sought bids for two components of an asbestos removal project at its Northport Power Station (hereafter, the "Project"); one component was securing a contractor to provide scaffolding and the other component was hiring a contractor to remove asbestos.  Grid disseminated an e-mail announcement automatically generated by an electronic bidding system, known as "Ariba", seeking bids for the scaffolding component of the Project.  The subject line of the e-mail read: "National Grid has invited you to participate in an event: AVS051710 INSULATION REMOVAL – MAIN STEAM AND HOT REHEAT PIPING AND SCAFFOLDING."  (Exhibit D, attached to Moulton Decl., hereafter, "E-Mail Invitation").)  Grid contends the E-Mail Invitation was its "Notice of Solicitation" (*see* Moulton Decl. at ¶6), despite that phraseology not being included anywhere withing the E-Mail Invitation.  (*See* E-Mail Invitation, Exhibit D, attached to Moulton Decl.)  Brand was one of the companies which received the E-Mail Invitation to bid or participate in event AVS051710.[1]

By clicking onto a link in the E-Mail Invitation, a participant could log into Ariba, review the specifications of event AVS051710, and submit a bid.  Scrolling down the computer screen

---

[1]Although Ariba event AVS051710 is an electronic record, in the summary judgment record, it is represented by computer screen-shots.  (*See* Exhibit E, attached to Moulton Decl.)

to review the specifications of the job, one comes to Item 3, entitled "Purpose Scope".  It states:

"Contractor to provide all labor, material, tools, equipment, supervision and *insurance* to

perform.  All activities shall be performed in accordance with this RFP and *it's* [*sic*] *associated*

*documentation*."  (*Id.* (emphasis added).)

Further down, one finds Item 8, entitled "Insurance Requirements".  (*Id.*)  This section

contains the statement:  "Attached are the insurance requirements and levels required for the

scope indicated.  Any exceptions to these requirements must be clearly identified."  (*Id.*)  Under

this statement is a document icon, labeled "References", which is a hyperlink[2] to two different

documents; there is no other text or statement in this section.  When clicked, the "References"

hyperlink brought up two documents, labeled as follows:

NATIONAL GRID
and its affiliates
<u>INSURANCE REQUIREMENTS</u>
FOR
ASBESTOS REMOVAL
HAZARDOUS WASTE REMOVAL & NON-HAZARDOUS WASTE REMOVAL

(Exhibit F, attached to Moulton Decl. (hereafter, "Asbestos Insurance Requirements")); and

NATIONAL GRID
and its affiliates
<u>INSURANCE REQUIREMENTS</u>
FOR
DESIGN & CONSTRUCT

---

[2]  "Hyperlink" is defined as "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document."  *Available at* https://www.merrian-webster.com/dictionary/hyperlink, accessed Mar. 27, 2017.  *See also* https://www.google.com/#q=definitions+hyperlink&*&spf=382 (hyperlink (n): "a link from a hypertext file or document to another location or file, typically activated by clicking on a highlighted word or image on the screen").

(Exhibit G, attached to Moulton Decl. (hereafter, "Construct Insurance Requirements", and collectively with the Asbestos Insurance Requirements, the "Insurance Requirements Documents").)

Each Insurance Requirements Document is separated into three sections: (I) General Requirements; (II) Required Coverage; and (III) Bonding. (*See* Exhibits F & G.) Section II.B, entitled "Commercial General Liability Insurance", was identical in both Documents. The contractor was to procure commercial general liability insurance, including personal injury, with minimum limits of liability of "$1,000,000 per occurrence Combined Single Limit" and "$2,000,000 General Aggregate". (*Id.* at Part II.B.) The Documents also identically state: "The Commercial General Liability policy shall include an endorsement stating the [*sic*] National Grid is an *additional insured* as respects operations relating to this contract or purchase order." (*Id.* at Part II.B.2 (emphasis added).) Section II.D, entitled "Umbrella Liability", required the procurement of an umbrella liability policy with a "$5,000,000 per occurrence/aggregate" policy limit. (*Id.* at Part II.D.)

In making its bid, Brand uploaded a "Certificate of Liability Insurance" (dated June 11, 2010) from insurer Ace to Brand with Grid being identified as the "Certificate Holder" and a description which stated:

> Project Name: Northport Station; National Grid Corporate Services LLC is listed as additional insured regarding the above General Liability and Auto Liability policies *pursuant to the terms and conditions of the written contract*. Excess Liability follows form.

(Exhibit H, attached to Moulton Decl. (emphasis added; hereafter, "Certificate of Insurance").) However, at the top of the Certificate was the statement:

> THIS CERTIFICATE IS *ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.* THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

(*Id.* (emphasis added).)

    3.  <u>The Agreement Between Grid and Brand (as the Successful Bidder)</u>

Brand was the successful bidder on the scaffolding component of the Project. In June 2010, Grid entered into a contract with Brand whereby Brand agreed to perform the scaffolding work for the Project (*i.e.*, the Agreement). For current purposes, the relevant sections of the Agreement are Article 10.A and Article 11.B.

    Article 10.A of the Agreement states:

> [Brand] (and all its subcontractors) . . . shall, at their own expense, procure and maintain until final completion and acceptance of the Work the following <u>minimum</u> insurance in forms and with insurance companies acceptable to [Grid]. [Brand] shall ensure that all its subcontractors are in compliance with these insurance provisions at all times. PRIOR TO THE START OF ANY WORK, [Brand] shall deliver a Certificate of Insurance showing that the insurance as outlined below is in force and that not less than sixty (60) days notice will be given to [Grid] prior to cancellation, termination or material alteration of said insurance. [Brand] shall not commence Work or bring its employees, subcontractors, materials or equipment on the site or any other [Grid] site until [Brand] delivers an acceptable Certificate of Insurance to [Grid's] Risk Management Department. . . . *The required insurance set forth in the **Notice of Solicitation** identified in Article 1, Paragraph B.1 of this Agreement is incorporated and hereby made part of this Agreement.*

(Agreement, Art. 10.A, attached as Exhibit A to Dalberth Decl. (ECF No. 63-5)[3] (underlined emphasis in original, italicized and bolded emphasis added).) In turn Article 1, Paragraph B of

---

[3] The Agreement is also included as Exhibit C, attached to the Moulton Declaration.

the Agreement identifies the following:

> 1.  Performance and Scope of Work
> * * *
> **B.**  All Work and materials required under this Agreement shall be in accordance with the documents listed below:
>
> **1.  National Grid's RFQ #AVS051710, Doc. 18129077, and the resulting Purchase Order (the "Purchase Order");**
> 2.  National Grid, Specification, M-5340, dated April 19, 2010 and Specification M-05340, addendum, dated May 12, 2010;
> 3.  National Grid General Conditions Specification M-300, dated May 1, 2008;
> 4.  [Brand's] proposal, dated June 21, 2010.
>
> The documents listed above as items 1-4, together with all plans, drawings and specifications listed therein, are collectively defines as the "Specifications."
> * * *

(*Id.*, Art. 1.B (emphasis added).)  There is no mention of a "Notice of Solicitation" in Paragraph

B.1 or any of the other subparagraphs of Paragraph B.

Article 11.B provides:

> [Brand] shall indemnify and hold harmless and defend [Grid] . . . from and against any and all obligations, fees, charges, demands, damages, costs, losses including, but not limited to property damage and personal injury or death resulting therefrom, claims, penalties, or expenses, including, but not limited to attorneys' fees and expenses of litigation, accounting consulting, or engineering fees and related expenses, judgments, liens and encumbrances arising out of or in any way connected with Work performed by [Brand] . . . whether or not it be claimed or proven that there was negligence or breach of statutory duty or both upon the part of [Grid] . . . except where such indemnity would be precluded by New York State General Obligation Law, Section 5-322.1, or by other applicable law, provided however, that such statutory preclusion shall not relieve [Brand], any subcontractors, or any insurers thereof of their obligations under Article 10, INSURANCE.

(*Id.*, Art. 11.B.)

4. <u>The Relevant Documents of Article 1, Paragraph B</u>

(a) *RFQ #AVS051710, Doc. 18129077*

RFQ #AVS051710, Doc. 18129077 (the "RFQ") was the Ariba bidding event for scaffolding and asbestos removal identified in the E-Mail Invitation. As discussed, it is an electronic record. *See supra* at pp. 3-5.

(b) *The Resulting Purchase Order*

When Brand was selected as the successful bidder for the scaffolding work on the Project, a Purchase Order was generated. It consists of six (6) pages, with the title "A KSE Printed Purchase Order.txt" appearing at the top of each page. (Exhibit I, attached to Moulton Decl.) In the upper right corner of each page of the document is the number "613225 4" (*Id.*) While Brand is listed on the Purchase Order, it is not identified as the contractor. (*See id.*) Under the listing of Brand (with its address), is another number, *to wit*, "511599", followed by the dates and notations: "22-JUN-10 Scott, A 27-APR-11 Scott, A". (*See id.*) That numbering and those dates are on each page of the six pages of the Purchase Order.

On the first page of the Purchase Order, the following instruction is provided:

> ALL WORK SHALL BE PERFORMED IN ACCORDANCE WITH:
> 1) CONTRACTORS [SIC] WRITTEN PROPOSAL DATED JUNE 14, 2010, REVISED JUNE 24, 2010;
> 2) NATIONAL GRID STANDARD TERMS AND CONDITIONS DATED JUNE 21, 2010;
> 3) *INSURANCE REQUIREMENTS, SERVICE TO FACILITY*;
> 4) SPECIFICATIONS:
>     A) M-300 GENERAL CONDITIONS, DATED MAY 2008.
>     B) M-5340 SPECIFICATION DATED APRIL 19, 2010

(*Id.* (emphasis added).)  On the third page of the Purchase Order is the statement:  "You are not authorized to proceed with this order until you have complied with all applicable insurance requirements *specified in 'National Grid Corporate Services LLC' insurance requirements identified in this Purchase Order*."  (*Id.* (emphasis added)*.*)  No such titled document has been produced.

There is no dispute that Brand commenced scaffolding Work for Grid on its Project.

5.  Llaguno's Alleged Injury and State Court Action

One of Brand's employees, Llaguno, alleges that on September 24, 2010, he suffered injury from a slip and fall sustained while performing the scaffolding work of the Project. Llaguno claims that he suffered those injuries "solely and wholly by reason of the negligence, carelessness and recklessness" of Grid.  (Llaguno Compl. at ¶ 6, attached as Exhibit A to Grid's Verified Complaint, further attached to Notice of Removal, ECF No. 1-1.)  In November 2010, Llaguno brought the Llaguno Action against Grid seeking damages.

6.  Grid's Subsequent Tender

Pursuant to the Agreement, in December 2010, Grid tendered the Llaguno Action to Brand for it to defend the same (hereafter, the "Tender").  Responding to Grid's Tender, Brand requested the documents referenced in Article 1.B of the Agreement.  While Grid provided documents in response, it never produced a document entitled "Notice of Solicitation".  (*See* Exhibits F, G, H, I, all attached to Dalberth Decl.; *cf.*, Exhibit D, attached to Moulton Decl.; *see also* Moulton Decl. at ¶6 (identifying the E-Mail Invitation as Grid's "Notice of Solicitation").) Brand refused the requested Tender.

*B. Procedural Background*

After Brand's refusal of Grid's Tender, on January 18, 2013, Grid brought a state court action against Brand, Ace, and Llaguno.  (*See* Grid's Verified Complaint, attached to Notice of Removal, ECF No. 1-1.)  In its Verified Complaint, Grid alleges that Brand breached its contractual duty "to properly procure and maintain insurance coverage on . . . Grid's behalf . . ." (*Id.* at ¶12.)  It also contends that Ace "is in breach of its commercial general liability policy with Brand" having "refused to defend and indemnify" Grid against the Llaguno Action.  (*Id.* at ¶13.)  Grid's claims are premised upon Article 10.A and Article 11.B of the Agreement.

On March 13, 2011, the Defendants removed Grid's Verified Complaint to this Court. (*See* ECF No. 1.)  They also sought to have Llaguno re-aligned as a plaintiff, as he was a nominal defendant whose interests were more properly aligned with those of Grid.  (*See* ECF No. 13.)  On December 30, 2013, and in light of Grid's consent (*see* ECF No. 31), the Court entered an electronic order granting the Defendants' re-alignment motion (*see* DE dated Dec. 30, 2013).

Further, ruling on Defendants' motion to dismiss (*see* ECF No. 33), the Court dismissed Grid's cause of action alleging Brand's breach of a contractual duty to indemnify.  (*See* Verified Complaint at ¶14; *see also* Memorandum and Order (dated Dec. 8, 2014), at 10-11, ECF No. 34 (granting in part and denying in part Defendants' motion to dismiss).)  Grid has two remaining claims: (1) breach of contract for failure to procure insurance as against Brand  (*see* Verified Complaint at ¶12); and (2) as against Ace, breach of contract for failure to defend and indemnify Grid in the Llaguno Action(*see id.* at ¶13).  Both of these causes of action rest upon there being a written contract between Grid and Brand requiring Brand to name Grid as an additional insured under Brand's Policy with Ace.

The parties have cross-moved for summary judgment. (*See* ECF No. 63 (the Defendants' Summary Judgment Motion); ECF No. 65 (Grid's Summary Judgment Motion).)

The essence of Grid's arguments are: (1) that by the unambiguous terms of the Agreement – including documents incorporated therein – Brand was to name Grid as an additional insured under Brand's Policy, but Brand failed to do so; (2) the Agreement also required Brand to defend, indemnify and hold harmless Grid against all claims related to Brand's scaffolding work on the Project, but it has failed to do so when a triggering event occurred; and (3) Brand's Policy with Ace contains various endorsements under which Grid qualifies as an additional insurer, but Ace, nonetheless, refuses to provide Grid coverage in the underlying Llaguno Action.

Conversely, the Defendants assert that there have been no breaches of contractual obligations since there is nothing in the four corners of the Agreement requiring Brand to name Grid as an additional insured and no extrinsic documents have been properly incorporated by reference imposing such a requirement. Similarly, because of the alleged failed incorporations by reference, Brand and Ace contend there is no written contract obligating them to provide Grid with insurance coverage in the Llaguno Action.

III. Discussion

*A. The Applicable Law*

1. <u>Summary Judgment Standard</u>

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or

other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). In each case, the relevant governing law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the nonmovant, that no rational jury could find in the nonmovant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion which is properly supported by affidavits, depositions, or other documentation, the nonmovant must offer similar materials setting forth specific facts showing there is a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). More than a "scintilla of evidence", *see Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *see Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), is required of the nonmovant. Nor can the nonmovant rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

Further, when considering a summary judgment motion, a district court must be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmovant's claim. *See id.* at 210-11. Where a movant who does not carry the underlying burden of proof offers evidence that the nonmovant has failed to establish his claim, the burden shifts to the nonmovant to offer "persuasive evidence that [his] claim is not implausible." *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587). The nomoving party's evidence is " 'to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor.' " *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)(quoting *Anderson*, 477 U.S. at 255)).

2. New York State Law Regarding Contract Interpretation, Generally

Under New York law, "a writing's ambiguity is a question of law to be resolved by the courts 'by looking within the four corners of the document, not to outside sources.'" *Petrello v. White*, 507 F. App'x 76, 78 (2d Cir. 2013) (quoting *Lockheed Martin Corp., v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011); further citation omitted); *see also Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83(2d Cir. 2002).

> "As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties," *Hunt* [*Ltd. v. Lifschultz Fast Freight, Inc.*], 889 F.2d [1274,] 1277 [(2d Cir. 1989)](emphasis added); "[t]he best evidence of what parties to a written agreement intend is what they

say in their writing," *Greenfield* [*v. Philles Records, Inc.*], 98 N.Y.2d [562,] 569, 750 N.Y.S.2d [565,] 569, 780 N.E. 166 [(N.Y. Ct. App. 2012)](internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms," *id.*, "without the aid of extrinsic evidence," *International Multifoods*, 309 F.3d , at 83(internal quotation marks omitted); *see, e.g., Network Publishing Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir. 1990) ("[W]e must consider the words [of the contract] themselves for they are always the most important evidence of the parties' intention" (internal quotation marks omitted)); *Bailey* [*v. Fish & Neave*], 8 N.Y.3d [523,] 528, 837 N.Y.S.2d [600,] 603, 868 N.E.2d 956 ("[w]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language" (internal quotation marks omitted)).

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467-68 (2d Cir. 2010); *see also Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (agreement is not ambiguous "when contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion"); *In re South Side House, LLC*, 470 B.R. 659, 672 (Bankr. E.D.N.Y. 2012)(discussing interpreting a contract under New York law).

Furthermore, "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) (internal quotation marks omitted). Therefore, "[i]t is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning . . ." *HSBC Bank USA v. Nat'l Equity Corp.*, 279 A.D.2d 251, 253, 719 N.Y.S.2d 20, 22 (N.Y. App. Div. 1st Dep't 2001). Any ambiguity in a contract is interpreted against the drafter. *See, e.g., McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d

1221, 124 (2d Cir. 2002); *see also, e.g., Zurich Am. Ins. Co., v. Wausa Bus. Ins. Co.,* No. 14-cv-3382, 2016 WL 4532196, *6 (S.D.N.Y. Aug. 29, 2016)(discussing "*contra proferentem* principle, which holds that 'equivocal contract provisions are generally to be construed against the drafter'" (quoting *Landpen Co., L.P. v. Maryland Cas. Co.*, No. 03-cv-3624, 2005 WL 356809, at *4 (S.D.N.Y. Feb. 15, 2005)); further citation omitted); *Constellation Power v. Select Energy*, 467 F. Supp.2d 187, 203 (D. Conn. 2006)(interpreting New York law)("A court will not rewrite the contract for the parties or relieve a sophisticated contracting party from terms that it later deems disadvantageous.")

    3.  New York State's "Doctrine of Incorporation by Reference"

    "Whether an extrinsic document is deemed to be incorporated by reference is a matter of law." *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03-cv-10254, 2007 WL 1288592, at *4 (S.D.N.Y. May 1, 2007)(citing *Camferdam v. Ernst & Young Int'l, Inc.*, No. 02-cv-10100, 2004 WL 307292, at *4 (S.D.N.Y. Feb. 13, 2004); further citation omitted). "Under New York law, an extrinsic document is deemed to be incorporated by reference only when the agreement specifically references and sufficiently describes the document to be incorporated, such that the latter 'may be identified *beyond all reasonable doubt*.'" *Id.* (quoting *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996))(emphasis added in *Bybyk*; further citation omitted). A general reference to another document is insufficient as a matter of law to incorporate that other document into the subject agreement or contract. *See Sea Trade Co.*, 2007 WL 1288592, at *4. Rather, "[i]t must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid." *Creative Waste Mgmt. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp.2d 582, 602 (S.D.N.Y. 2006)(citing *Bybyk*, 81 F.3d at 1201; further citation

omitted).

*B. Application of the Applicable Law to the Instant Case*

Here, there is no dispute that Grid and Brand entered into the Agreement. Nor is there a dispute that there is no stated requirement in the four corners of the Agreement that Brand name Grid as an additional insured under Brand's Policy with Ace. Therefore, the Court must determine if there has been any extrinsic document properly incorporated by reference into the Agreement, such that Brand was required to name Grid as an additional insured. If there has been proper incorporation by reference of such a document, Grid is entitled to summary judgment. Only one such document is necessary. Conversely, if there is no such document, the blanket additional insured endorsement in Brand's Policy with Ace is inapplicable since it is predicated on Brand having entered into a written contract that requires Brand to name that organization as an additional insured. Then, the Defendants are entitled to summary judgment.

Article 10 of the Agreement (hereafter, the "Insurance Provision") concludes that "[t]he required insurance set forth in the Notice of Solicitation *identified in Article 1, Paragraph B.1 of this Agreement* is incorporated and hereby made part of this Agreement." (Agreement, Art. 10 (emphasis added).) Thus, it is clear that Brand was to refer to the identified document (or documents) in Article 1, Paragraph B of the Agreement for the insurance it was required to carry in order for it to proceed with the identified Work under the Agreement, and that identified document (or documents) was(were) incorporated into, and therefore, made a part of the Agreement.

Turning to Article 1, Paragraph B.1 of the Agreement, there was no identified Notice of Solicitation. (*See* Agreement, Art. 1, ¶B.1.) Indeed, there was no mention of a "Notice of

Solicitation" at all. Rather, two other documents were identified: (1) Grid's "RFQ #AVS051710,

Doc 18129077" (*id.*) (*i.e.*, the RFQ), and (2) "the resulting Purchase Order (the "Purchase

Order")" (*id.*).

The Defendants argue that because there was no Notice of Solicitation, there was no

identified insurance requirements with which Brand needed to have complied. Grid contends

that its Notice of Solicitation was the Ariba-generated E-Mail Invitation which invited different

vendors – including Brand – to participate in a bidding event, identified as "AVS051710

INSULATION REMOVAL – MAIN STEAM AND HOT REHEAT PIPING AND

SCAFFOLDING." (*See* Moulton Decl. at ¶6 (identifying Exhibit D as Grid's "Notice of

Solicitation").) It posits that one was synonymous for the other. This initial argument by Grid is

unavailing.

First, the E-Mail Invitation is not listed or otherwise identified in the designated section

of the Agreement, *to wit*: Article 1, Paragraph B.1. Second, the E-Mail Invitation is completely

devoid of any "Notice of Solicitation" label or notation, such that anyone would understand it to

be that Notice. In the absence of some descriptor to convey that information, the E-Mail

Invitation, even if synonymous with the "Notice of Solicitation", was not specifically referenced

or sufficiently described such that it could be identified beyond all reasonable doubt, thereby

warranting its incorporation by reference into the Agreement.[4] *See Sea Trade*, 2007 WL

1288592, at *4 ("extrinsic document is deemed to be incorporated by reference only when the

_____

[4] Even if the Court were to have determined that the E-Mail Invitation was incorporated
by reference into the Agreement, such incorporation would not advance Grid's position herein.
The E-Mail Invitation makes no reference to insurance, let alone advise a potential bidder of the
required insurance to be provided. (*See* Exhibit D.) Grid concedes as much. (*See* Exhibit M at
¶24, attached to Dalberth Decl. (Grid's Response to Supplemental Requests for Admissions).)

agreement specifically references and sufficiently describes the document to be incorporated . . .").

Grid next posits that the RFQ, identified in Article 1, Paragraph B.1 and which is an electronic record,[5] is incorporated by reference into the Agreement.  Since the RFQ is explicitly named and identified with a series of letters and numbers that was used for the Ariba bidding event and assigned a "Doc" number, and so named and identified in the specific section of the Agreement as stated in the Insurance Provision, it has been specifically referenced and sufficiently described as a document to be incorporated.  Moreover, having utilized it to make its bid on the Project (as evidenced, in part, by its uploading of a certificate of insurance in the "Insurance Requirements" section of the RFQ), Brand cannot be heard to deny knowledge of the RFQ.  As a matter of law, therefore, the RFQ is deemed incorporated by reference into the Agreement.

However, that does not end the Court's analysis.  The Court must also determine whether the Insurance Requirements Documents attached to the RFQ are also properly incorporated such that they, too, may be considered part of the Agreement.

As discussed, *supra* at pp. 3-5, under the Insurance Requirements section of the RFQ (*i.e.*, Item 8 of the RFQ), was the hyperlink, entitled "References", which followed the instruction:  "Attached are the insurance requirements and levels required for the scope indicated."  This hyperlink produced two different documents: the Asbestos Insurance Requirements and the Construct Insurance Requirements.  Neither Insurance Requirements

---

[5] *See supra* note 1 (noting that in the summary judgment record, the RFQ is comprised of computer screen-shots from the Ariba electronic bidding system).

Document referenced the RFQ nor the Project.  However, each contained several identical

provisions, including, *to wit*:  "The Commercial General Liability policy *shall include an*

*endorsement stating* . . . National *Grid is an additional insured* as respects operations relating to

this contract or purchase order."  (*See* Exhibits F & G at Section II.B.2 (emphasis added),

attached to Moulton Decl.)  Further, the insurance limitations in both Insurance Requirements

Documents were the same.  (*See id.; see also supra* at pp. 4-5.)  There was nothing further

available through the "References" hyperlink.

    The Court would be remise if it ignored the electronic nature of commercial transactions

in today's world.  Indeed, there is no dispute here that both Grid and Brand used Ariba, an

electronic bidding system, with the former using Ariba to seek bids for the Project and the latter

using Ariba to make its bid.  As to the Project's Insurance Requirements, Grid uploaded the

Insurance Requirements Documents to the RFQ.  The hyperlink to those Documents was

appropriately and conspicuously located in the"Insurance Requirements" section of the RFQ,

directly below the instructive statement that the Project's insurance requirements and scope of

coverage where attached.  Despite neither Document referencing the RFQ or the Project, the

hyperlink to them created a direct, specific avenue to access documents containing what was

required to comply with Grid's insurance component of the Project.  In other words, the use of

the "References" hyperlink created a controlled pathway to specific documents, thereby

assuaging concerns of reasonable doubt as to the documents sought to be incorporated into the

Insurance Requirements section of the RFQ.  Stated differently, in the context of the RFQ, the

instant hyperlink created a closed universe, where the only documents that could be referenced

where those accessible through the "References" hyperlink portal.[6]  This is not a case where one document (*e.g.*, the RFQ) is making references to another, vague or general class of documents. *Cf., Sea Trade*, 2007 WL 1288592, at *4 (where subject signature cards referring generally to a bank's rules and regulations and not expressly naming a document containing those rules and regulations, determining reference to rules and regulations insufficient to find incorporation by reference.).  Moreover, while not proof of coverage, Brand's uploading its Certificate of Insurance evinces its knowledge of and assent to the insurance requirements.  *See Creative Waste Mgmt.*, 429 F. Supp.2d at 602 ("[i]t must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid"); *see also Mikada Group, LLC v. T.G. Nickel & Assocs., LLC*, No. 13-cv-8259, 2014 WL 7323420, *13 (S.D.N.Y. Dec. 19, 2014) (same)(quoting *Lamb v. Emhart*, 47 F.3d 551, 558 (2d Cir. 1995)); *see also Lamb*, 47 F.3d at 558 ("[e]vidence of knowledge and assent may be found in the circumstances surrounding the agreement")(quoted in *Sea Trade*, 2007 WL 1288592, at * 5).

Finally, the Court notes that despite the "References" hyperlink bringing the user to two different Insurance Requirements Documents, one regarding asbestos removal and the other regarding design and construct, *see supra* at p. 4, that does not create reasonable doubt of a kind which would defeat incorporation by reference.  That is so because the essential terms of each Document, *i.e.*, naming Grid as an additional insured and the scope of coverage required, were the same in both Documents.  Thus, alleged confusion as to what was required for insurance by

---

[6]  The Court is cognizant that not all hyperlinks are as narrowly constructed as the instant one, where only the two Insurance Requirements Documents were accessible.  Accordingly, for clarity, it is noted that the Court's determination regarding the instant hyperlink is limited to the facts presented in this case.

accessing the "References" hyperlinked Documents is specious.  In any event, it does not present a material dispute that would preclude the granting of summary judgment.

Having determined that the Insurance Requirements Documents have been, as a matter of law, incorporated by reference into the RFQ (which the Court has already determined to have been properly incorporated into the Agreement), pursuant to the Agreement, Brand was required to name Grid as an additional insured on its Policy.  There is an absence of evidence in the summary judgment record that Brand complied with that requirement.  However, the Defendants concede:

> The [P]olicy does contain a blanket additional insured endorsement which makes any organization an additional insured under the [P]olicy if Brand has entered into a written contract that requires it to name that organization as an additional insured on its [P]olicy.

(Defendants' Memo in Support of Mot. Summ. J. at 1-2 (ECF No. 63-1).)  Accordingly, Grid is an additional insured under the Policy since Brand entered into the Agreement which, through properly incorporated by reference documents, required Brand to name Grid as an additional insured on the Policy.

* * *

Grid has requested the Court grant its Summary Judgment Motion "in its entirety and direct[] both BRAND and ACE . . . to defend and indemnify" it in the Llaguno Action.  (Grid's Memo. In Support of Mot. Summ. J. at 21 (ECF No. 65-2).)  However, this Court has previously dismissed "Grid's claims against Brand based on the indemnity provision at Article 11 without prejudice and with the right to renew upon a determination as to . . . Gird's liability" in the Llaguno Action.  (Memorandum and Order (dated Dec. 8, 2014), at 10-11, ECF No. 34.)

## IV. Conclusion[7]

Accordingly, IT IS HEREBY ORDERED that Grid's Summary Judgment Motion is GRANTED. Ace is directed to defend and indemnify Grid in the underlying Llaguno Action. In accordance with the Court's prior decision on the Defendants' Motion to Dismiss, Grid may pursue claims against Brand based on Article 11 of the Agreement after a determination as to Grid's liability in the Llaguno Action.

IT IS FURTHER ORDERED that the Defendants' Summary Judgment Motion is DENIED.

The Clerk of Court is directed to enter judgment in favor of the Grid.

Dated this 30th day of March 2017 at Central Islip, New York.

_____/s/_____
Denis R. Hurley
Senior District Court Judge, E.D.N.Y.

---

[7] Regarding the Defendants' Letter Motion seeking permission to file a motion to strike (ECF No. 67), Grid's Opposition Letter (ECF No. 68), and the Court's Electronic Order (DE dated June 7, 2016) (stating the Court will address the Letter Motion when it decides the current cross-motions for summary judgment): To the extent the Defendants seek to have the Court strike the additional seven pages in Grid's Reply memorandum, *i.e.*, pages 11-17, or the entire Reply memorandum (*see* ECF No. 65-27), that request is denied. While the Court does not countenance noncompliance with its Individual Practice Rules (here, Rule 3E (instructing that reply memoranda are not to exceed 10 pages)), in this instance – having made its determination on other grounds – it found it unnecessary to consider Grid's arguments raised in those excess pages. Therefore, the Defendants have not been prejudiced. Moreover, as a court has inherent discretion to strike excessive pages, it must also have reciprocal discretion to waive page limits. *See generally, e.g., Emanuel v. Griffin*, 2015 WL 1379007, at *15-16 (discussing courts' inherent authority to impose sanctions for noncompliance with court rules and orders); *Snyder v. Shenendehowa Cent. School Dist.*, 244 F.R.D. 152, 155 (N.D.N.Y. 2007)("District courts are granted vast inherent discretionary powers to manage their dockets and cases.").